## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JULIETTE BRYANT,

                Plaintiff,                          CASE NO: 19-cv-10479-ALC

v.

DARREN K. INDYKE and RICHARD D. KAHN,
in their capacities as the executors of the
ESTATE OF JEFFREY EDWARD EPSTEIN,

                Defendants.

_____

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 1

ARGUMENT .................................................................................................................... 4

I. Defendants Have Not Met Their Burden of Proving that Plaintiff's Claims Are Untimely ..... 4

   A. Plaintiff's Claims Are Timely Under N.Y. C.P.L.R. § 215(8)(a). .................................... 5

      1. The Indictment Was Not Restricted to Minors. .......................................................... 6

      2. Plaintiff's Claims Concern the Same Sex-Trafficking Operation that the Indictment Concerned. ........................................................................................................... 7

      3. Defendants' Attempts to Narrow the Scope of C.P.L.R. § 215(8)(a) Fail. ..................... 8

   B. Plaintiff's Claims are Timely Pursuant to N.Y. C.P.L.R. § 213-c. ................................... 10

   C. N.Y. C.P.L.R. § 202 Does Not Apply to Plaintiff's Claims. ............................................ 13

      1. Statutory Interpretation Precludes the Application of C.P.L.R. § 202. ...................... 13

      2. Plaintiff's Claims Did Not Accrue "Without the State" of New York. ...................... 14

      3. Plaintiff's Residency When the Cause of Action Accrued Is a Factual Issue. ........... 14

   D. Defendants Have Not Met Their Burden of Proving that Plaintiff Cannot Invoke Equitable Estoppel. ......................................................................................................... 15

   E. Defendants Have Not Met Their Burden of Proving that Plaintiff Cannot Invoke Equitable Tolling. ........................................................................................................... 17

II. The Court Should Deny the Defendants' Motion to Dismiss Punitive Damages. .................. 19

   A. Defendants' Motion to Dismiss Punitive Damages is Procedurally Improper. ................ 19

   B. Plaintiff May Recover Punitive Damages in this Case. .................................................. 20

      1. USVI Law on Punitive Damages Governs This Case. ............................................... 20

      2. USVI Law Would Allow for Punitive Damages against Defendants. ......................... 22

         a. *Banks* Factor One: Whether Any USVI Courts Have Adopted a Rule ................. 22

         b. *Banks* Factor Two: The Position Taken by a Majority of Courts from Other Jurisdictions ............................................................................................... 23

         c. *Banks* Factor Three: The Soundest Rule for the USVI ....................................... 24

   CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Antone v. Gen. Motors Corp.*,
   473 N.E.2d 742 (N.Y. 1984).............................................................................. 15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................................... 4

*Babcock v. Jackson*,
   191 N.E.2d 279 (N.Y. 1963)........................................................................... 20

*Banks v. Int'l Rental & Leasing Corp.*,
   55 V.I. 967 (V.I. 2011) ............................................................................ 22, 25

*Booth v. Bowen*,
   No. CIV. 2006-217, 2008 WL 220067 (D.V.I. Jan. 10, 2008) .............................. 23

*Brown v. Parkchester S. Condos.*,
   287 F.3d 58 (2d Cir. 2002).............................................................................. 18

*Burrows v. Bd. of Assessors for Town of Chatham*,
   98 A.D.2d 250 (3d Dep't 1983), *aff'd*, 473 N.E.2d 748 (N.Y. 1984).................... 13

*Childers v. New York & Presbyterian Hosp.*,
   36 F. Supp. 3d 292 (S.D.N.Y. 2014).............................................................. 4, 17

*Christodoulou v. Terdeman*,
   262 A.D.2d 595 (2d Dep't 1999) ....................................................................... 9

*CIT Bank N.A. v. Schiffman*,
   948 F.3d 529, 537 (2d Cir. 2020), *certified question accepted*, No. 36, 2020 WL 729773
   (N.Y. Feb. 13, 2020) ..................................................................................... 25

*Clemens v. Nealon*,
   202 A.D.2d 747 (3d Dep't 1994) ..................................................................... 13

*Coffman v. Coffman*,
   60 A.D.2d 181 (2d Dep't 1977) ....................................................................... 12

*Crabtree ex. Rel. Kemp v. Estate of Crabtree*,
   837 N.E.2d 135 (Ind. 2005) ........................................................................... 24

*Davis v. Jackson*,
   No. 15-cv-5359, 2016 WL 5720811 (S.D.N.Y. Sept. 30, 2016) .......................... 18

*DeMartino v. Rivera*,
   148 A.D.2d 568 (2d Dep't 1989) ..................................................................... 15

*Denton v. McKee*,
   332 F. Supp. 2d 659 (S.D.N.Y. 2004) ............................................................................... 20

*Ellis v. Zuck*,
   546 F.2d 643 (5th Cir. 1977) ........................................................................................... 23

*Estate of Farrell ex rel. Bennett v. Gordon*,
   770 A.2d 517 (Del. 2001) ................................................................................................. 23

*Flight Sci., Inc. v. Cathay Pac. Airways Ltd.*,
   647 F. Supp. 2d 285 (S.D.N.Y. 2009) ............................................................................... 18

*Funk v. Belneftekhim*,
   No. 14-CV-0376 (BMC), 2019 WL 3035124 (E.D.N.Y. July 11, 2019) .............................. 16

*Gallina v. Thatcher*,
   No. 2017-52980, 2018 N.Y. Misc. LEXIS 8435 (Sup. Ct. Oct. 23, 2018) ............................. 9

*Gen. Stencils, Inc. v. Chiappa*,
   219 N.E.2d 169 (N.Y. 1966) ............................................................................................. 16

*Gleason v. Holman Contract Warehousing, Inc.*,
   649 N.Y.S.2d 647 (Sup. Ct. 1996) .................................................................................... 12

*Gotlin v. Lederman*,
   No. 05-CV-1899 (ILG), 2006 WL 1154817 (E.D.N.Y. Apr. 28, 2006) ................................. 17

*Gov't of the V.I. v. Connor*,
   60 V.I. 597 (V.I. 2016) ................................................................................................. 22, 24

*Guardian Ins. Co. v. Gumbs*,
   No. ST-15-CV-195, 2016 WL 9525609 (V.I. Super. Aug. 22, 2016) .................................... 25

*Guobadia v. Irowa*,
   103 F. Supp. 3d 325 (E.D.N.Y. 2015) ............................................................................... 19

*Hamilton v. Dowson Holding Co.*,
   51 V.I. 619 (D.V.I. 2009) .................................................................................................. 23

*Hammerman v. Louis Watch Co.*,
   7 A.D.2d 817 (3d Dep't 1958) .......................................................................................... 15

*Haralson v. Fisher Surveying, Inc.*,
   31 P.3d 114 (Ariz. 2001) .................................................................................................. 23

*Harris v. City of New York*,
   186 F.3d 243 (2d Cir. 1999) ............................................................................................... 4

iv

*Hofer v. Lavender*,
    679 S.W.2d 470 (Tex. 1984) ....................................................................... 23

*In re Gleason (Michael Vee, Ltd.)*,
    749 N.E.2d 724 (2001) ............................................................................... 12

*In re S. African Apartheid Litig.*,
    617 F.Supp.2d 228 (S.D.N.Y. 2009) ......................................................... 18

*Jones v. City of New York*,
    No. 18-CV-1937 (VSB), 2020 WL 1644009 (S.D.N.Y. Apr. 2, 2020) ........... 19, 20

*Kaopuiki v. Kealoha*,
    87 P.3d 910 (Haw. Ct. App. 2003) ............................................................ 23

*Kashef v. BNP Paribas S.A.*,
    925 F.3d 53 (2d Cir. 2019) ................................................................. 4, 7, 9, 10

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941) ................................................................................... 20

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
    274 F.3d 706 (2d Cir. 2001) ...................................................................... 17

*LaRocca v. Collen IP*,
    No. 08 Civ. 6274, 2009 WL 10435869 (S.D.N.Y. May 6, 2009) .................. 8

*McElliott v. City of New York*,
    No. 15 CIV. 7107 (LGS), 2017 WL 6210840 (S.D.N.Y. Dec. 7, 2017) .......... 9

*McGuirk v. City Sch. Dist. of Albany*,
    116 A.D.2d 363 (3d Dep't 1986) ............................................................... 11

*Meegan S. v. Donald T.*,
    475 N.E.2d 449 (N.Y. 1984) ................................................................. 11, 12

*Nat'l Jewish Democratic Council v. Adelson*,
    417 F. Supp. 3d 416 (S.D.N.Y. 2019) ........................................................ 21

*Padula v. Lilarn Prop. Corp.*,
    644 N.E.2d 1001 (N.Y. 1994) .................................................................... 20

*Perry v. Melton*,
    299 S.E.2d 8 (W. Va. 1982) ....................................................................... 23

*Schultz v. Boy Scouts of Am., Inc.*,
    65 N.Y.2d 189 (1985) ................................................................................ 21

*Siegfried v. Siegfried*,
    92 A.D.2d 916 (2d Dep't 1983) ............................................................... 15

*Tillett v. Lippert*,
    909 P.2d 1158 (Mont. 1996) ................................................................... 23

**Statutes**

N.Y. Penal Law § 130.35 ............................................................................. 11

N.Y. Stat. Law § 51 ..................................................................................... 12

N.Y. Stat. Law § 54 ..................................................................................... 12

N.Y. Stat. Law § 76 ..................................................................................... 13

**Rules**

Fed. R. Civ. P. 12 ........................................................................................ 19

N.Y. C.P.L.R. § 202 ........................................................................ 4, 13, 14, 15

N.Y. C.P.L.R. § 213-c .......................................................................... *passim*

N.Y. C.P.L.R. § 215 ............................................................................. *passim*

**Other Authorities**

Brief of Defendants-Appellees, *Kashef v. BNP Paribas S.A.*,
    No. 18-1304 (2d Cir. Aug. 9, 2018), Dkt. 92 .......................................... 10

Complaint, *GVI v. Estate of Jeffrey E. Epstein*,
    No. ST-20-CV-014 (V.I. Sup. Ct. Jan. 15, 2020) .................................... 22

N.Y. Comm. Rep., 2019 N.Y. S.B. No. 6574, 42nd Legis. Sess. (June 17, 2019) ...................... 11

Restat. (Second) of Torts § 908 ................................................................. 23

Transcript of Pre-motion Conference, *Farmer v. Indyke, et al.*,
    No. 19-cv-10475 (LGS) (S.D.N.Y. Mar. 5, 2020), Dkt. 39 ....................... 5

Plaintiff Juliette Bryant, by and through her undersigned attorneys, respectfully submits this Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint.[1]

## PRELIMINARY STATEMENT

For decades, Jeffrey Epstein and his co-conspirators recruited countless young women to his homes across the world, and forced them to give him massages that escalated into sexual assault. Juliette Bryant was just one of many victims that Epstein and his co-conspirators recruited to be a part of their sex-trafficking operation when she was a young woman. Epstein offered to help Plaintiff with her dream of modeling in New York, but instead sexually abused her for years.

Defendants contend that Plaintiff's claims are untimely, but wholly ignore the burden that they bear to prove such an affirmative defense at this stage of this litigation. *First*, Plaintiff's claims are timely under N.Y. C.P.L.R. § 215(8)(a), which provided Plaintiff with one year from the termination of the criminal action again Epstein to file an action. *Second*, Plaintiff's claims are timely under N.Y. C.P.L.R. § 213-c, which provides rape victims with 20 years to bring an action against the perpetrator. *Third*, Defendants have failed to meet their burden of showing that Plaintiff will be unable to invoke equitable estoppel and equitable tolling, highly factual doctrines. Finally, Defendants' motion to "dismiss" Plaintiff's demand for punitive damages is procedurally improper and incorrect. The Court should deny Defendants' motion to dismiss in full.

## STATEMENT OF FACTS

In 2002, Juliette Bryant was a 20-year old aspiring model living in South Africa. Compl. ¶ 38. She had never left the country, but dreamed of becoming a model in New York City. *Id.* ¶¶ 39, 41. One day, she met Naja Hill, an American model visiting South Africa, who offered her the opportunity to meet a man who Hill called the "King of America" and who could help her

---

[1]      Plaintiff respectfully requests oral argument pursuant to Individual Rule 2.F.

achieve her dream of modeling in New York City.  *Id.* ¶ 38.  That man was Jeffrey Epstein, who was visiting South Africa with an American government official, an actor, and a comedian.  *Id.*

Juliette agreed, and met Epstein and his high-profile entourage at a restaurant.  *Id.* ¶ 39. They invited Juliette to attend the government official's speech the next day, accompanied by a police escort.  *Id.*  Epstein asked Juliette to bring her modeling portfolio to his hotel for a "casting," told her that he owned a modeling agency and could get her an agent in New York City, and bragged that he was good friends with Les Wexner, the owner of Victoria's Secret.  *Id.*  ¶ 40. Because of his clear power and relationships with high-profile individuals, Juliette believed him. After assuring Juliette's mother that she would be safe with him, Epstein's employees facilitated her travel to New York City, including by getting her a passport.  *Id.* ¶¶ 40-41.

When Juliette arrived in New York, Sarah Kellen, one of Epstein's employees, called Juliette and told her that she would be traveling to the Caribbean with Epstein on his private plane. *Id.* ¶ 42.  On the flight, Juliette felt terrified and trapped.  *Id.* ¶¶ 43-45.  Juliette eventually arrived at Epstein's island in the U.S. Virgin Islands ("USVI"), and Kellen sent Juliette to Epstein's room for a massage.  *Id.* ¶ 44.  That was when Epstein began sexually assaulting Juliette.  *Id.*  During the massages, he would touch her, use massage devices on her, force her to perform oral sex on him, and rape her.  *Id.*  She cried herself to sleep each night.  *Id.* ¶ 45.  For years, Epstein continued to sexually traffic Juliette.  Epstein sexually abused Juliette during each visit, and at all of his homes, including his New York mansion.  *Id.* ¶ 46.

From the start, Juliette's interactions with Epstein were always defined by his power and control:  immediately introducing her to a high-level government official who was traveling with two celebrities and a police escort, and showing her his private plane, numerous mansions, private island, and large staff that he used to give the false impression of legitimacy.  *Id.* ¶¶ 39, 42-44.

Epstein purposefully displayed photographs of powerful political figures in his mansion to show that he was well-connected and powerful. *Id.* ¶ 48. And if that was not clear enough, Epstein specifically told Juliette that he planted drugs on another girl who accused him of rape and had her sent to prison. *Id.* ¶ 47. Even after Juliette was able to distance herself from Epstein in 2004, he continued to contact her over the years, and, two months before his death, asked her to send him nude photographs. *Id.* ¶¶ 50, 51. The experiences Epstein subjected her to left Juliette with an eating disorder, debilitating panic attacks, anxiety, and substance abuse issues. *Id.* ¶ 52.

After decades of escaping appropriate punishment for his extraordinarily far-reaching and disturbing crimes, Epstein was indicted in July 2019 on one count of sex trafficking conspiracy and one count of sex trafficking. Compl., Ex. A (the "Indictment"). The Indictment specifically described how Epstein recruited victims to come to his New York and Florida mansions to give him massages. Indictment ¶¶ 3, 9, 15. During the massages, Epstein "would escalate the nature and scope of physical contact with his victims to include, among other things, sex acts such as groping and direct and indirect contact with the victim's genitals" with his hands or sex toys. *Id.* ¶¶ 9, 15. Afterwards, Epstein and his associates would continue to contact victims to schedule appointments for additional sexual encounters so that he could continue to abuse them. *Id.* ¶¶ 11, 17. Juliette's claims arise directly from this scheme of recruitment and sexual assault.

On August 8, 2019, shortly after Epstein's Indictment, Epstein executed his last will and testament, naming Defendants the executors of his Estate. Compl. ¶ 30. Two days later, Epstein was found dead in his jail cell. *Id.* ¶ 31. His last will and testament was filed in the USVI on August 15, 2019. *Id.* ¶ 32. The U.S. Attorney's Office submitted a proposed *nolle prosequi* order and Judge Richard M. Berman dismissed the indictment on August 29, 2019. *Id.* ¶ 36. Plaintiff filed her Complaint shortly thereafter, on November 14, 2019.

# ARGUMENT

Defendants' motion to dismiss Plaintiff's claims and Plaintiff's request for punitive damages should be denied. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). The Court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 58 (2d Cir. 2019).

Drawing all reasonable inferences in Plaintiff's favor, Defendants have failed to meet their burden of proving that Plaintiff's claims are untimely. Further, Defendants' argument that the Court should "dismiss" punitive damages is procedurally improper and substantively incorrect.

## I.     Defendants Have Not Met Their Burden of Proving that Plaintiff's Claims Are Untimely.

Because the statute of limitations is an affirmative defense, Defendants bear the burden of proving that Plaintiff's claims are untimely. *See Childers v. New York & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 301 (S.D.N.Y. 2014). "[A] complaint does not need to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses." *Id.* at 315 (internal quotation marks omitted). Accordingly, "dismissal is appropriate only if a complaint clearly shows the claim is out of time." *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999). In this case, Plaintiff's factual allegations demonstrate that (A) her claims are timely under N.Y. C.P.L.R. § 215(8)(a), (B) her claims are timely under C.P.L.R. § 213-c, (C) C.P.L.R. § 202 does not apply to her claims, (D) Defendants are equitably

estopped from asserting a statute of limitations defense, and (E) the limitations period for bringing her claims was equitably tolled. [2]

### A. Plaintiff's Claims Are Timely Under N.Y. C.P.L.R. § 215(8)(a).

Plaintiff's claims fall squarely within N.Y. C.P.L.R. § 215(8)(a), which allowed Plaintiff to file her complaint within a year of the Indictment's dismissal. That provision provides that:

> Whenever it is shown that a criminal action against the same defendant has been commenced with respect to the event or occurrence from which a claim . . . arises, the plaintiff shall have at least one year from the termination of the criminal action . . . in which to commence the civil action . . . .

*Id.* Plaintiff filed the Complaint within one year of the Indictment's dismissal—her claims are therefore timely. Defendants' only argument to the contrary is that the Indictment did not concern the same event or transaction from which Plaintiff's civil action arose because the Indictment targeted, according to Defendants, some separate sex-trafficking operation that only involved underage girls. Defs.' Mem. at 7 ("Because Plaintiff alleges she was between 20 and 22 years old when Decedent assaulted her (Compl. ¶¶ 1, 38, 50), this action and the Indictment necessarily arise from different events or occurrences."). But Defendants mischaracterize § 215(8)(a), the case law, Plaintiff's Complaint, and, most egregiously, the vast sex-trafficking operation that the Indictment targeted.

---

[2]  In another victim's action against the Estate, the court recognized that the doctrines of equitable estoppel and equitable tolling are "very fact specific" and accordingly asked Defendants to refrain from filing a motion to dismiss prior to discovery. Transcript of Pre-Motion Conference at 3:4-8, *Farmer v. Indyke, et al.*, No. 19-cv-10475 (LGS) (S.D.N.Y. Mar. 5, 2020), Dkt. 39 ("[T]he doctrines of equitable estoppel and equitable tolling could, nevertheless, save the claims and make them timely and that is very fact specific, or early in the case I presumed there will be factual issues around those questions . . . .").

1.     The Indictment Was Not Restricted to Minors.

As an initial matter, the Indictment covered the crimes Defendants committed against Plaintiff, notwithstanding the fact that she did not allege that she was a child when they occurred. Defendants seek to minimize the scope of the abuse alleged in the Indictment by focusing on its reference to "minors." Defs.' Mem. at 7, 9-10. But clinging to the use of the word "minors" does not change the nature of the vast and sophisticated operation alleged in the Indictment. Epstein's pattern and practice was to recruit and traffic young females that he knew he could exploit, and the Indictment spells out that pattern. Age is not the deciding factor as to whether a female was a victim of Epstein's sex-trafficking operation and the patterns of recruitment and abuse described in the Indictment. And the fact that many of the victims were minors does not mean that non-minors were not also victimized by Epstein's sophisticated sex-trafficking operation. Indeed, the Indictment states that "many" of Epstein's victims were minors, demonstrating that prosecutors were investigating Epstein's crimes against young women over the age of 18 as well. Indictment ¶ 11 ("[Epstein] knew that many of his New York victims were underage."); *id*. ¶ 17 ("JEFFREY EPSTEIN, the defendant, knew that *certain of his victims* were underage . . . ." (emphasis added)).[3]

The mere fact that Plaintiff did not allege that she was a minor at the time that she was recruited into Epstein's sex-trafficking scheme does not negate the fact that Plaintiff's civil claims arise from the acts described in the Indictment. Plaintiff therefore had one year from August 29,

---

[3]     The FBI confirmed this understanding of the Indictment's scope in a press release issued two days after Epstein's arrest, stating to Epstein's victims: "We want to hear from you, regardless of the age you are now, or *whatever age you were then*, no matter where the incident took place." https://www.justice.gov/usao-sdny/pr/jeffrey-epstein-charged-manhattan-federal-court-sex-trafficking-minors (last visited March 30, 2020) (emphasis added).

2019, the date on which Judge Berman formally dismissed the Indictment, to file the Complaint. Having filed suit on November 14, 2019, her claims fall well within that limitations period.

2. <u>Plaintiff's Claims Concern the Same Sex-Trafficking Operation that the Indictment Concerned.</u>

Even if the Indictment was for some reason limited to Epstein's trafficking of minors (to the exclusion of other victims), Plaintiff's claims would nonetheless arise from the same "event or occurrence" for the purposes of § 215(8)(a). *See, e.g., Kashef*, 925 F.3d at 62 (noting that "a New York appellate court explicitly rejected the theory that the tolling provisions of CPLR 215(8) are exclusively for the benefit of the victims of the crime charged in the criminal proceeding" (internal quotation marks omitted)). Contrary to Defendants' suggestion, the Court should not construe the Indictment "narrowly," Defs.' Mem. at 7, where the Indictment itself describes a pattern of abuse against numerous victims spanning a number of years. Epstein repeated the same patterns of recruitment and abuse time and time again on countless young females, including Plaintiff. *See, e.g.*, Indictment ¶ 7 (explaining that Epstein "perpetuated [the] abuse in similar ways" against victims). The Indictment was therefore not limited to neatly categorized events that happened on specified dates—it covered a sprawling sex-trafficking operation that occurred "over the course of many years" and affected an unspecified number of victims. *Id*. ¶ 1.

Defendants' contention that the Indictment does not concern the same sex-trafficking operation that victimized her is incorrect. Defs.' Mem. at 9-10. The sex-trafficking operation that the Indictment described is precisely the same sex-trafficking operation that Plaintiff was lured into. Just as the Indictment alleged that Epstein enticed and recruited females to engage in sex acts with him in multiple locations, Indictment ¶ 1, Epstein enticed and recruited Plaintiff to engage in sex acts with him in New York, the USVI, France, Florida, and New Mexico. Compl. ¶¶ 25, 55. Just as the Indictment alleges that the abuse would start out with the victim performing a

7

massage on Epstein, Indictment ¶¶ 9, 15, Plaintiff's abuse started when Sarah Kellen sent her to massage Epstein. Compl. ¶ 44. The Indictment alleges that Epstein would escalate the nature and scope of physical contact during the massages to include sex acts such as groping and touching victims with sex toys, Indictment ¶¶ 9, 15, and Epstein escalated the nature and scope of Plaintiff's massages to include touching her and using massage devices on her, among other things. Compl. ¶ 44. And, finally, just as Epstein or his employees would contact victims to schedule their return to his home for additional sexual encounters, Indictment ¶ 11, Epstein contacted Plaintiff many times to arrange for her to travel back to the United States for sex. Compl. ¶ 46. The conduct alleged in the Indictment is precisely the conduct alleged in the Complaint.

3.    Defendants' Attempts to Narrow the Scope of C.P.L.R. § 215(8)(a) Fail.

Defendants seek to advance a strained interpretation of § 215(8)(a)'s "event or occurrence" requirement, asserting that this Court must "apply C.P.L.R. § 215(8)(a) narrowly" to limit its availability to the crimes committed against the specific victims identified in the Indictment. Defs.' Mem. at 7. But § 215(8) "is a remedial measure intended to alleviate victims of crime from the strict and arbitrary nature of the statute of limitations and to make it easier for such victims to obtain civil redress for the criminal wrongs that they have endured." *LaRocca v. Collen IP*, No. 08 Civ. 6274, 2009 WL 10435869, at *2 (S.D.N.Y. May 6, 2009). New York courts "are instructed to give broad and liberal construction to remedial statutes" like § 215(8). *Id.* Defendants' narrow interpretation of § 215(8)(a) "would frustrate the Legislature's goal of making it easier for victims of crimes to obtain civil redress for the criminal wrongs that they have endured." *Id.*

Further, the cases that Defendants cite to narrow § 215(8)(a)'s scope are inapposite. The criminal actions in those cases focused on crimes that occurred on specified dates and both cases explicitly recognized that the relevant criminal prosecutions were commenced "only in connection with the events of these [specific] days." *See Christodoulou v. Terdeman*, 262 A.D.2d 595,

8

595-596 (2d Dep't 1999) (criminal prosecution against defendant commenced only in connection with events on two specific days); *Gallina v. Thatcher*, No. 2017-52980, 2018 N.Y. Misc. LEXIS 8435, at *3-4 (Sup. Ct. Oct. 23, 2018) (plaintiff sued for assault and battery that occurred over the course of two years but the indictment "charged [the defendant] for incidents occurring on three (3) specific dates"). By contrast, the Indictment in this case was not limited to a specific day or discrete event. Rather, the Indictment covered sexual abuse that occurred "over the course of many years." Indictment ¶¶ 1–2, 8, 20, 24. Further, the Indictment charged Epstein with conspiracy and a broad sex-trafficking scheme, while the criminal actions in *Christodoulou* and *Gallina* charged the defendants with crimes stemming from isolated incidents.[4]

In contrast, the Second Circuit's opinion in *Kashef* controls and demonstrates why Plaintiff's claims fall within § 215(8)(a) here. In *Kashef*, BNP Paribas ("BNPP") entered a guilty plea conceding "knowledge of the atrocities being committed in Sudan and of the consequences of providing Sudan access to U.S. financial markets." *Kashef*, 925 F.3d at 56. The plaintiffs, Sudanese victims of mass rape, torture, deliberate infection with HIV, and other atrocities, filed a complaint against BNPP within a year of the judgment of conviction, contending that their claims were timely under C.P.L.R. § 215(8)(a). *Id*. at 57, 62–63. BNPP attempted to argue—similar to Defendants' argument here—that § 215(8)(a) did not apply because the plaintiffs "played no role in the proceedings surrounding BNP Paribas's plea agreement," the criminal action "required no investigation of or briefing on any injuries sustained by Plaintiffs," and the facts in the criminal

---

[4]     Defendants also cite *McElligott v. City of New York*, No. 15 CIV. 7107 (LGS), 2017 WL 6210840, at *5 (S.D.N.Y. Dec. 7, 2017), but that case is inapplicable because it hinged on whether the defendant in the civil action was the same defendant charged in the criminal action.

case and the civil case were not "identical."  Brief of Defendants-Appellees at 51–52, *Kashef v. BNP Paribas S.A.*, No. 18-1304 (2d Cir. Aug. 9, 2018), Dkt. 92.

The Second Circuit rejected BNPP's argument, and instead found that the "event or occurrence" for § 215(8) purposes was more generally "BNPP's conspiracy with Sudan to violate U.S. sanctions" for humanitarian violations.  925 F.3d at 62–63.  The court therefore held that the victims of those humanitarian violations could bring timely claims under § 215(8)(a).  *Id.*  That conspiracy, like the one here, was a broad scheme spanning many years, rather than a single event (such as an assault on a specified date).  Just as BNPP's conspiracy to violate sanctions was the relevant event or occurrence in *Kashef*, Epstein's widespread sex-trafficking scheme is the event or occurrence at issue in Plaintiff's case for the purposes of applying § 215(8)(a).  Defendants attempt to distinguish *Kashef* by pointing out that "the civil and criminal actions in that case both arose out of the same conspiracy between BNP and Sudan to violate U.S. sanctions," Defs.' Mem. at 10, but that fact only highlights *Kashef*'s applicability to this case, which also involves a civil action and a criminal action arising from the same conspiracy.  Defendants have failed to meet their burden of proving that Plaintiff's claims do not arise from the same event or occurrence as the Indictment, and therefore that § 215(8)(a) does not apply to her claims.[5]

### B.      Plaintiff's Claims are Timely Pursuant to N.Y. C.P.L.R. § 213-c.

Plaintiff's claims are also timely under N.Y. C.P.L.R. § 213-c, which provides that:

> Notwithstanding any other limitation set forth in this article, . . . all civil claims or causes of action brought by any person for physical, psychological or other injury or condition suffered by such person

---

[5]      Defendants argue that a broad construction of § 215(8)(a) would make the "event or occurrence" language "meaningless." Defs.' Mem. at 9.  But Plaintiff does not ask the Court to disregard the "event or occurrence" limitation.  Rather, she contends that the "event or occurrence" in this case is a sex-trafficking scheme, not the abuse of a delineated victim, and that because she was a victim of that sex-trafficking scheme, her claims arise from it.

> as a result of conduct which would constitute rape in the first degree as defined in section 130.35 of the penal law, . . . may be brought . . . within twenty years.

N.Y. C.P.L.R. § 213-c.[6] Plaintiff alleges that Epstein sexually assaulted her multiple times within 20 years of the filing of this lawsuit, and that the assaults constituted one or more sex crimes listed in § 213-c. Compl. ¶¶ 44, 56. Her claims are therefore timely under § 213-c.

Defendants contend that the 20-year statute of limitations of § 213-c does not apply to Plaintiff's claims because it was adopted in 2019 and does not apply retroactively. Defs.' Mem. at 10–12. But New York "[c]ourts have employed customary tools of construction to find the requisite intent to give retroactive effect to new laws affecting periods of limitation." *McGuirk v. City Sch. Dist. of Albany*, 116 A.D.2d 363, 365 (3d Dep't 1986). Using those tools, New York courts have held that certain amendments to limitations periods apply retroactively. *See, e.g.*, *Meegan S. v. Donald T.*, 475 N.E.2d 449, 450 (N.Y. 1984) ("[T]he enlargement of the Statute of Limitations for paternity suits is to be applied retroactively.").

Contrary to Defendants' argument, the text and legislative history of § 213-c demonstrate the New York Legislature's intent for it to apply retroactively. The bill's legislative history highlights the "ticking clock" that the former statute of limitations imposed on victims of sexual abuse: "For crimes of sexual violence in particular, the clock ticks against the trauma and culture of silence that prevents victims from speaking out. Over the last year, victims who have suffered in silence for decades have bravely spoken about their abuse . . . ." N.Y. Comm. Rep., 2019 N.Y. S.B. No. 6574, 242nd Legis. Sess. (June 17, 2019). The Legislature's explicit reference to "victims who have suffered in silence for decades," like Plaintiff, and victims that have been prevented

---

[6] "A person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person . . . [b]y forcible compulsion." N.Y. Penal Law § 130.35.

"from speaking out," also like Plaintiff, evince an intent for the provision to apply retroactively to victims like Plaintiff. In light of the legislative goals behind the amendment to § 213-c, the Court should hold that it applies retroactively to Plaintiff's claims.

Moreover, "remedial legislation should be given retroactive effect in order to effectuate its beneficial purpose." *In re Gleason (Michael Vee, Ltd.)*, 749 N.E.2d 724, 726 (N.Y. 2001). In citing N.Y. Stat. Law § 51 for the proposition that statutes are construed as applying only prospectively, Defendants wholly ignore § 54, which explicitly states that "[r]emedial statutes constitute an exception to the general rule that statutes are not to be given a retroactive operation." The primary case the Defendants cite also recognizes that remedial statutes are given retroactive effect. *See* Defs.' Mem. at 11 (citing *Gleason v. Holman Contract Warehousing, Inc*., 649 N.Y.S.2d 647, 651 (Sup. Ct. 1996) (recognizing that whether statute is remedial "does greatly impact upon the decision as to whether or not the new statute should be held to be retroactive")).

Legislative history establishes that the amendment to § 213-c was remedial in nature—it extended the statute of limitations for certain sexual offenses in order to correct the injustice that the shorter limitations period imposed on victims. *See Coffman v. Coffman*, 60 A.D.2d 181, 188 (2d Dep't 1977) ("Remedial statutes are those designed to correct imperfections in prior law, by generally giving relief to the aggrieved party." (internal quotation marks omitted)); *see also Meegan S.*, 475 N.E.2d at 450 (finding that amendment extending statute of limitations in paternity suits was remedial legislation); https://www.governor.ny.gov/news/governor-cuomo-joined-leaders-times-movement-signs-legislation-extending-rape-statute (last visited March 30, 2020) ("This new law recognizes the injustice that has gone on for far too long . . . ."). "[I]nsofar as remedial statutes are concerned, the court should consider the mischief sought to be remedied and should favor the construction which will suppress the evil and advance the remedy." *Burrows*

*v. Bd. of Assessors for Town of Chatham*, 98 A.D.2d 250, 253 (3d Dep't 1983) (internal quotation marks and citations omitted), *aff'd*, 473 N.E.2d 748 (N.Y. 1984). The remedial purpose of the amendment to § 213-c, to correct the injustice of providing rape victims who were prevented from speaking out with only five years to bring actions, would be undermined if the amendment were only applied prospectively. Plaintiff's claims are therefore timely under § 213-c.

### C.   N.Y. C.P.L.R. § 202 Does Not Apply to Plaintiff's Claims.

By its express terms, New York's borrowing statute, N.Y. C.P.L.R. § 202, only applies to "[a]n action based upon a cause of action accruing without the state." Contrary to Defendants' argument, § 202 does not apply to or bar Plaintiff's claims for three independent reasons.

### 1.   Statutory Interpretation Precludes the Application of C.P.L.R. § 202.

Under principles of statutory interpretation, § 202 does not apply. In both § 215(8)(a) and § 213-c, both of which apply to Plaintiff's claims as argued above, the New York Legislature included language that explicitly precludes § 202's application. Section 215(8)(a) specifically states that a plaintiff has one year after an indictment's dismissal to assert her claims, "*notwithstanding that the time in which to commence such action has already expired.*" (Emphasis added). That the Legislature intended to afford plaintiffs the ability to pursue civil actions in connection with a prosecuted crime, even if the statute of limitations had expired, is clear and unambiguous, and the Court need go no further to find that § 215(8)(a) precludes the application of § 202. N.Y. Stat. Law § 76 ("Where words of a statute are free from ambiguity and express plainly, clearly and distinctly the legislative intent, resort may not be had to other means of interpretation."); *see also Clemens v. Nealon*, 202 A.D.2d 747, 749 (3d Dep't 1994) (citing Stat. Law § 76 and finding that § 215(8) is clear and unambiguous).

Similarly, § 213-c provides that victims of certain criminal sexual acts have 20 years to assert a cause of action, "[n]otwithstanding *any other limitation* set forth in" Article 2, and § 202

is a limitation set forth in Article 2. (Emphasis added). Under the unambiguous language of § 215(8)(a) and § 213-c, Plaintiff's claims would be timely even if § 202 would otherwise render Plaintiff's claims untimely under the statute of limitations of another jurisdiction.

2.     <u>Plaintiff's Claims Did Not Accrue "Without the State" of New York.</u>

Section 202 only applies to claims "accruing without the state." Defendants wholly ignore the concept of accrual, and argue that because Plaintiff was sexually assaulted in many places, her claims must fall within the limitations periods of all of the jurisdictions in which Epstein ever harmed her. Defs.' Mem. at 4-5. This is incorrect. As an initial matter, Defendants' arguments on this point concede that Plaintiff's claims are timely when based on the multiple assaults Plaintiff suffered in the state of New York. *See* Compl. ¶ 46 ("Epstein forced her to travel to the United States many times to see Epstein and be subjected to repeated sexual abuse for one to two weeks at a time, sometimes staying in his New York apartment."). And as to the instances where Plaintiff was raped or abused in other locations, those crimes still accrued inside the state, as they were planned and initiated in New York, which served as the epicenter of Epstein's sex-trafficking conspiracy. For example, Epstein and his co-conspirators lured Plaintiff to New York, and it was from New York that Epstein sent Plaintiff to other locations to be abused. *See id*. ¶ 41 ("Epstein called Juliette's mother from New York to assure her that Juliette would be safe with him in New York."); *id.* ¶ 42 ("Shortly after arriving at the apartment, Sarah Kellen, another one of Epstein's co-conspirators, called and told Juliette that Juliette was going to the Caribbean.").

3.     <u>Plaintiff's Residency When the Cause of Action Accrued Is a Factual Issue.</u>

Finally, § 202 does not apply if the plaintiff is a New York resident, and the controlling date for determining a plaintiff's residence is the date on which the cause of action accrued, not the date on which the action was commenced. *See, e.g.*, *DeMartino v. Rivera*, 148 A.D.2d 568,

570 (2d Dep't 1989). "[T]he determination of whether a plaintiff is a New York resident, for purposes of CPLR 202, turns on whether [she] has a significant connection with some locality in the State as the result of living there for some length of time during the course of a year." *Antone v. Gen. Motors Corp.*, 473 N.E.2d 742, 746 (N.Y. 1984). The Complaint alleges that Plaintiff was a New York resident at all relevant times, as she had always wanted to live in New York, Epstein's co-conspirators got Plaintiff a visa so that she could travel to New York often, and when she visited she stayed at Epstein's New York home for one to two weeks at a time. Compl. ¶ 39 ("Juliette considered meeting Epstein an amazing opportunity because modeling in New York City had always been one of her biggest dreams"); ¶ 41 ("Groff told Juliette that Epstein wanted to bring her to New York City to model" and "Epstein called Juliette's mother from New York to assure her that Juliette would be safe with him in New York."); ¶ 46. Whether Plaintiff can establish that she was a New York resident at the time her cause of action accrued is a factual issue. In fact, in each of the cases Defendants cite in contending that Plaintiff was not a New York resident at the time her cause of action accrued (two of which did not address § 202), the residency determination was made after fact-finding on the issue. *See Antone*, 473 N.E.2d at 745 (hearing held on residence); *Siegfried v. Siegfried*, 92 A.D.2d 916, 916 (2d Dep't 1983) ("residency hearing" held in connection with motion to transfer venue); *Hammerman v. Louis Watch Co.*, 7 A.D.2d 817, 818 (3d Dep't 1958) (relying on affidavits in connection with motion to transfer venue).

D. **Defendants Have Not Met Their Burden of Proving that Plaintiff Cannot Invoke Equitable Estoppel.**

Even if the Court were to hold that C.P.L.R. § 215(8)(a) and § 213-c do not apply to Plaintiff's claims, or that § 202 does, it should hold that they are still timely under the doctrine of equitable estoppel. The Complaint alleges in detail the methods of intimidation and control that Jeffrey Epstein and his co-conspirators used to deter their victims from seeking justice, and the

scare tactics that he used on Plaintiff. Due to Epstein's conduct, Plaintiff did not take action until after she knew that Epstein was dead, and timely filed her claim approximately three months later.

Defendants' contend that the doctrine of equitable estoppel applies only to situations in which the defendant makes a misrepresentation of fact. Defs.' Mem. at 13-14. But "courts have long had the power, both at law and equity, to bar the assertion of the affirmative defense of the Statute of Limitations where it is the defendant's affirmative wrongdoing—a carefully concealed crime here—which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding." *Gen. Stencils, Inc. v. Chiappa*, 219 N.E.2d 169, 171 (N.Y. 1966). A defendant is therefore equitably estopped from asserting a statute of limitations defense if the defendant "wrongfully induced the plaintiff to refrain from timely commencing an action by deception, concealment, threats *or other misconduct*." *Funk v. Belneftekhim*, No. 14-CV-0376 (BMC), 2019 WL 3035124, at *2 (E.D.N.Y. July 11, 2019) (citation omitted) (emphasis added).

Assuming the truth of the allegations in Plaintiff's Complaint and drawing all inferences in her favor, Plaintiff has sufficiently pleaded misconduct that should equitably estop Defendants from asserting a statute of limitations defense. Plaintiff was terrified of disobeying Epstein. Compl. ¶¶ 43-44, 47-48. Defendants' claim that Plaintiff has not alleged "any conduct" by Epstein beyond trying to keep into contact with her is incorrect—Epstein *expressly* told Plaintiff that he had a rape victim sent to prison. Defs.' Mem. at 14; Compl. ¶ 47. Epstein also flaunted his connections to powerful government officials, introduced her to a high government official and two celebrities while accompanied by a police escort, kept nude photographs of her, and continued to harass her via email up until he died. Compl. ¶¶ 39-40, 42, 45, 47-51.

Plaintiff's allegations are more than sufficient to allow her claims to proceed under an equitable estoppel theory at this early stage of the litigation. And even if they were not, Plaintiff

was not required to "affirmatively plead facts in avoidance of" Defendants' statute of limitations defense. *Childers*, 36 F. Supp. 3d at 315 (internal quotation marks and citation omitted). Further, "[w]hether equitable estoppel applies in a given case is ultimately a question of fact." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001). Courts applying New York law have therefore reserved the highly factual issue of equitable estoppel for after discovery. *See, e.g.*, *Gotlin v. Lederman*, No. 05-CV-1899 (ILG), 2006 WL 1154817, at *13 (E.D.N.Y. Apr. 28, 2006) ("A vast majority of the cases on equitable estoppel permit plaintiffs to defeat a motion to dismiss on the pleadings, deferring the question until some discovery can be had.").

For example, Defendants unilaterally conclude that Plaintiff's state of mind of fearing the man behind a transcontinental sex-trafficking operation who (1) manipulated and assaulted her and countless other victims for years, (2) specifically told her that he could have his accusers sent to jail, (3) introduced her to a former government official and two celebrities the very first time they met, and (4) used power to escape punishment for crimes committed over decades is "unextraordinary." Defs.' Mem. at 14. Whether Plaintiffs' state of mind was "extraordinary" is a factual issue that should be decided after discovery, not by Defendants. Defendants have failed to meet their burden of proving that Plaintiff can prove no set of facts demonstrating her entitlement to equitably estopping Defendants from asserting a statute of limitations defense.

### E. Defendants Have Not Met Their Burden of Proving that Plaintiff Cannot Invoke Equitable Tolling.

Plaintiff's claims are also timely under the doctrine of equitable tolling. While equitable estoppel focuses on a defendant's affirmative misconduct, equitable tolling focuses on the plaintiff and applies as a matter of fairness where the plaintiff has been "prevented in some extraordinary way from exercising [her] rights." *Flight Sci., Inc. v. Cathay Pac. Airways Ltd.*, 647 F. Supp. 2d

285, 289 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).  In this case, Plaintiff's fear of retaliation prevented her from filing her claims prior to Epstein's death.

Defendants' contention that Plaintiff has not alleged any compelling circumstances justifying equitable tolling is incorrect.  Defs.' Mem. at 12-13.  A "reasonable fear of retaliation may be sufficient to constitute extraordinary circumstances warranting equitable tolling, particularly if the person threatening retaliation is a defendant." *Davis v. Jackson*, No. 15-cv-5359, 2016 WL 5720811, at *11 (S.D.N.Y. Sept. 30, 2016).  In *Davis*, the court reasoned that fear of retaliation could support equitable tolling in the prison context because "sustained control tends to result in adverse psychological effects that invariably have behavioral consequences" and that "fear of retaliation [is a] natural consequence[] of this unique psychological environment." *Id.* at *10 (internal quotation marks omitted).

Epstein's pattern of controlling, manipulating, and intimidating his victims caused similar psychological effects in his countless victims as described in *Davis*.  And Plaintiff alleges that Epstein's abuse and psychological manipulation had such effects on her.  Compl. ¶¶ 44-48, 52-53. The Court should therefore extend equitable tolling to reach fear of retaliation in the context of Epstein's unprecedented abuse of and control over his victims, including Plaintiff.

In any event, as with equitable estoppel, "when plaintiffs raise an equitable tolling argument, a court must deny a motion to dismiss based on the statute of limitations unless all assertions of the complaint, as read with required liberality, would not permit the plaintiffs to prove that this statute was tolled." *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 287 (S.D.N.Y. 2009) (internal quotation marks omitted).  Plaintiff's allegations are sufficient to defeat a motion to dismiss and to proceed to discovery on the issue of equitable tolling. *See, e.g.*, *Brown v. Parkchester S. Condos.*, 287 F.3d 58, 60–61 (2d Cir. 2002) (evidentiary hearing appropriate to

determine whether limitations period was equitably tolled); *Guobadia v. Irowa*, 103 F. Supp. 3d 325, 341 (E.D.N.Y. 2015) (equitable tolling "is a question appropriately reserved for a jury" due to "genuine issues of material fact"). Defendants are not factfinders in this case and cannot decide whether the circumstances of Epstein's sex-trafficking operation are "extraordinary" enough to warrant tolling. They have failed to meet their burden of proving that Plaintiff can prove no set of facts demonstrating entitlement to equitable tolling.

## II.    The Court Should Deny the Defendants' Motion to Dismiss Punitive Damages.

Defendants' argument that Plaintiff's claim for punitive damages fails as a matter of law is incorrect. Not only are such damages available, they are warranted in this case. Beyond the procedural impropriety of Defendants' purported motion to dismiss punitive damages—that on its own warrants its denial—under New York choice-of-law principles the law of the USVI applies to the issue of punitive damages. Under USVI law, a court may allow for punitive damages against the estate of a deceased tortfeasor, especially when that tortfeasor went to great lengths during his life to avoid punishment for causing immeasurable harm to countless victims.

### A.    Defendants' Motion to Dismiss Punitive Damages is Procedurally Improper.

As an initial matter, the Court should not decide whether punitive damages are available at this early stage. A motion to dismiss is not the proper vehicle for determining the availability of punitive damages. Rule 12(b)(6) allows a defendant to file a motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Accordingly, "[a] motion to dismiss is addressed to a 'claim'—not to a form of damages." *Jones v. City of New York*, No. 18-CV-1937 (VSB), 2020 WL 1644009, at *17 (S.D.N.Y. Apr. 2, 2020) (internal quotation marks omitted). Defendants' request for the Court to dismiss Plaintiff's demand for punitive damages does not relate to whether Plaintiff has failed to state a claim for battery or intentional infliction of

emotional distress. Addressing the issue of punitive damages at this stage would therefore be premature. *See, e.g.*, *Denton v. McKee*, 332 F. Supp. 2d 659, 667 (S.D.N.Y. 2004) (finding "any discussion of damages, compensatory, punitive or otherwise, to be premature" at the motion to dismiss stage). And Defendants' argument that punitive damages are prohibited by law does not make their "motion to dismiss" a form of damages proper. *Jones*, 2020 WL 1644009, at *17 (holding that although punitive damages are not available against government entities, motion to dismiss punitive damages was premature).

### B. Plaintiff May Recover Punitive Damages in this Case.

Even if a motion to dismiss punitive damages was an adequate way to address this issue, Defendants' motion still fails. Plaintiff may recover punitive damages because the USVI has the strongest interest in whether punitive damages are available in this case.[7] And, under USVI law, Plaintiff can recover punitive damages.

### 1. USVI Law on Punitive Damages Governs This Case.

Federal courts look to the choice-of-law rules of the forum state in deciding choice-of-law disputes. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "In the context of tort law, New York utilizes interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation. The greater interest is determined by an evaluation of the facts or contacts which relate to the purpose of the particular law in conflict." *Padula v. Lilarn Prop. Corp.*, 644 N.E.2d 1001, 1002 (N.Y. 1994) (internal quotation marks and alterations omitted). New York courts seek "[j]ustice, fairness and the best practical result." *Babcock v. Jackson*, 191 N.E.2d 279, 283 (N.Y. 1963).

---

[7]     As explained below, under the doctrine of depecage New York law still governs as to the underlying claims and as to compensatory damages.

"Punitive damages are conduct regulating," and "[u]nder the doctrine of depecage, then, the choice-of law analysis for punitive damages is distinct from the analysis for compensatory damages." *Nat'l Jewish Democratic Council v. Adelson*, 417 F. Supp. 3d 416, 425-26 (S.D.N.Y. 2019). "[U]nder New York law—for punitive damages in particular—a court must consider the object or purpose of the wrongdoing to be punished and give controlling weight to the law of the jurisdiction with the strongest interest in the resolution of the particular issue presented." *Id.* at 426 (internal quotation marks and alterations omitted). "[T]he choice-of-law inquiry for punitive damages provisions is necessarily 'defendant-focused.'" *Id.*

In this case the USVI has a stronger interest in the resolution of whether punitive damages can be awarded in this case than New York, Florida, New Mexico, or France.[8] In addition to flying Plaintiff to the USVI and sexually assaulting her there, Compl. ¶¶ 42–44, Epstein was domiciled in the USVI. *Id.* ¶ 19; *see also Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 201 (1985) (holding that, although New York was the place of the wrong, New Jersey law applied because it "would further [New Jersey's] interest in enforcing the decision of its domiciliaries to accept the burdens as well as the benefits of" New Jersey law). Epstein also had a private island in the USVI, where he abused countless young females, including Plaintiff. Compl. ¶¶ 24, 44. Defendants then chose to probate his Estate in and under the laws of the USVI. *Id.* ¶ 32. Having availed themselves of all the benefits and protections that USVI probate and estate law have to offer, Defendants

_____

[8]     To the extent Defendants rely on Judge Engelmayer's recent decisions in *Mary Doe v. Indyke et al.*, 19-cv-10758 (PAE) (DCF) (S.D.N.Y. Apr. 28, 2020) and *Jane Doe 15 v. Indyke, et al.*, 19-cv-10653 (PAE) (DCF) (S.D.N.Y. Apr. 30, 2020), those cases are easily distinguishable. Neither of the victims in those cases was injured in the USVI. Here, not only was Epstein domiciled in the USVI and his Estate probated in the USVI, but he flew Plaintiff to the USVI and injured her there on numerous occasions. Compl. ¶ 55.

cannot also seek to escape its drawbacks.  New York, Florida, New Mexico, and France have no conceivable interest in denying the USVI from advancing that interest.  As such, New York's choice-of-law rules dictate the application of USVI law to the issue of punitive damages.[9]

>2. USVI Law Would Allow for Punitive Damages against Defendants.

USVI law would allow for an award of punitive damages in this case.  When determining how best to apply common law, courts in the USVI apply what is known as the *Banks* analysis. *See Gov't of the V.I. v. Connor*, 60 V.I. 597, 600, 602 (2016); *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 979 (2011).  Under the *Banks* analysis, "instead of mechanistically following the Restatements, courts should consider three non-dispositive factors to determine Virgin Islands common law: (1) whether any Virgin Islands courts have previously adopted a particular rule; (2) the position taken by a majority of courts from other jurisdictions; and (3) most importantly, which approach represents the soundest rule for the Virgin Islands."  *Connor*, 60 V.I. at 600 (internal quotation marks omitted).  Applying the *Banks* analysis, Plaintiff can pursue punitive damages against Defendants.

>a. *Banks* Factor One: Whether Any USVI Courts Have Adopted a Rule

USVI courts have not adopted a rule as to whether a plaintiff can pursue punitive damages against the estate of a deceased tortfeasor.  And Defendants' position that "USVI courts have favorably recited the Restatement's rule precluding punitive damages against a decedent tortfeasor's estate" is simply wrong.  Defs.' Mem. at 18.  First, the Restatement's position is

---

[9]    As an indication of the Virgin Islands' interest in matters concerning Epstein's Estate, the Attorney General of the United States Virgin Islands filed suit against the Estate on January 15, 2020, seeking, among other things, punitive damages.  Complaint, *GVI v. Estate of Jeffrey E. Epstein*, No. ST-20-CV-014 (V.I. Sup. Ct. Jan. 15, 2020), Dkt. No. 1.

included only in commentary, and not the text of the Restatement itself. Restat. (Second) of Torts § 908 cmt. a. Second, in both of the cases that Defendants cite, the issue before the court was whether punitive damages are available in wrongful death actions, and therefore whether an estate can recover punitive damages, *not* whether punitive damages are available *against* an estate. *See, e.g.*, *Hamilton v. Dowson Holding Co.*, 51 V.I. 619, 628 (D.V.I. 2009); *Booth v. Bowen*, No. CIV. 2006-217, 2008 WL 220067, at *5 (D.V.I. Jan. 10, 2008). Defendants have not cited a single USVI case adopting the Restatement's commentary's position on that specific issue, or addressing that issue at all. Given the lack of any rule in the Virgins Islands, this *Banks* factor is neutral.

b. *Banks* Factor Two: The Position Taken by a Majority of Courts from Other Jurisdictions

As to the second *Banks* factor, Defendants overstate the number of jurisdictions that do not permit the award of punitive damages against an estate. Defs.' Mem. at 19. Numerous courts have held that plaintiffs may recover punitive damages against the estate of a deceased tortfeasor. *See, e.g.*, *Haralson v. Fisher Surveying, Inc.*, 31 P.3d 114, 117 (Ariz. 2001) (concluding that "there are situations in which it would be appropriate, and perhaps even necessary, to express society's disapproval of outrageous conduct by rendering such an award against the estate of a deceased tortfeasor" (internal quotation marks omitted)); *Tillett v. Lippert*, 909 P.2d 1158, 1162 (Mont. 1996); *Perry v. Melton*, 299 S.E.2d 8, 12 (W. Va. 1982). Those courts have reasoned that punitive damages do not only serve to punish wrongdoers, but also to "motivate others not to engage in similar action in the future." *Kaopuiki v. Kealoha*, 87 P.3d 910, 928 (Haw. Ct. App. 2003).[10] In

---

[10] *See also, e.g.*, *Ellis v. Zuck*, 546 F.2d 643, 644–45 (5th Cir. 1977) (punitive damages allowed against estate because they provide "deterrents to others similarly situated from taking steps of the character condemned"); *Estate of Farrell ex rel. Bennett v. Gordon*, 770 A.2d 517, 521-22 (Del. 2001); *Hofer v. Lavender*, 679 S.W.2d 470, 474 (Tex. 1984).

this case, general deterrence is of the utmost importance—Epstein spent decades abusing countless young women and girls, intimidating them into silence, and gaming the justice system with his wealth and power to avoid punishment. No person should be able to commit such acts while at the same time considering himself to be above the law.

Further, in a case that Defendants cite, *see* Defs.' Mem. at 19, the court recognized that punitive damages might be available where, as here, the deceased tortfeasor takes his own life "as an escape from punitive damages." *Crabtree ex. Rel. Kemp v. Estate of Crabtree*, 837 N.E.2d 135, 139 (Ind. 2005) ("If we ever encounter a case where a tortfeasor seems to have considered his own death as an escape from punitive damages incident to some intentional tort, we can address that issue at that time."). Again, Epstein spent his life avoiding proportionate punishment for his countless crimes, and once he was finally imprisoned pending trial for his sex-trafficking operation, he signed his will and then almost immediately caused his own demise. *See* Compl. ¶¶ 8, 14, 30, 31. Given the unique facts surrounding Epstein's crimes and death and the importance of general deterrence, the second *Banks* factor weighs heavily in favor of allowing for punitive damages under these facts.

c.      <u>*Banks* Factor Three: The Soundest Rule for the USVI</u>

Although none of the three *Banks* factors is dispositive, the third factor—"which approach represents the soundest rule for the Virgin Islands"—is the most important. *See Connor*, 60 V.I. at 600. Defendants cite seven cases to support the proposition that USVI courts have found that the Restatement is the soundest rule for the USVI, Defs.' Mem. at 19–20, but not one of those cases addresses the question of whether punitive damages are available against an estate, nor do they consider the Restatement's position on that point.

Instead, the soundest rule for the USVI is to allow for punitive damages against an estate in circumstances as extraordinary as those in this case. The USVI has expressly recognized the

dual purpose of punitive damages to both punish wrongdoing and promote general deterrence. *See, e.g., Guardian Ins. Co. v. Gumbs*, No. ST-15-CV-195, 2016 WL 9525609, at *10 (V.I. Super. Aug. 22, 2016) ("[A] primary purpose behind punitive damages [is] . . . to further deter [the tortfeasor] and others like him from similar conduct in the future."). Allowing punitive damages in this case would be consistent with this view—punitive damages would deter other predators from manipulating the justice system and silencing victims of sexual abuse to avoid punishment. The absence of any USVI case adopting the Restatement's commentary about punitive damages against estates, coupled with the extraordinary nature of Epstein's transcontinental sex-trafficking enterprise, suggest that allowing for punitive damages in this case would be the soundest rule for the USVI.[11] The Court should therefore deny Defendants' motion to dismiss punitive damages.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss Plaintiff's Complaint. Because Defendants seek to dismiss Plaintiff's Complaint in full, Plaintiff requests oral argument on Defendants' motion.

---

[11] To the extent necessary, United States courts may certify questions to the Supreme Court of the Virgin Islands if there is "a question of law which may be determinative" and if "it appears there is no controlling precedent in the decisions of the Supreme Court." *Banks*, 55 V.I. at 972 (internal citations omitted). Because the issue would be a matter of first impression in the Virgin Islands, and given the split in common law authorities concerning the availability of punitive damages against a deceased tortfeasor's estate, the Court should certify the question to the Supreme Court of the Virgin Islands if it deems it necessary to resolve the issue at this stage of the case. *See CIT Bank N.A. v. Schiffman*, 948 F.3d 529, 537 (2d Cir. 2020), *certified question accepted*, No. 36, 2020 WL 729773 (N.Y. Feb. 13, 2020) (certifying questions where no precedent from state's highest court is available, and the state court was better situated to make "value judgments and important public policy choices").

Dated: May 12, 2020

Respectfully Submitted,

/s/ *Sigrid S. McCawley*

David Boies
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200

Sigrid McCawley
(Pro Hac Vice)
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

Joshua I. Schiller
Andrew Villacastin
Sabina Mariella
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(212) 446-2300

*Counsel for Plaintiff Juliette Bryant*